UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE  DIVISION


ESTATE OF STEPHEN TODD LEE (Judith)
Kluesner, Personal Representative of the       )
Estate),                                        )
           Plaintiff,                         )
                                              )
    vs.                                        )               3:09-cv-00016-RLY-WGH
                                              )
THE CITY OF WASHINGTON; OFFICER )
RICHIE TOLLIVER, in his individual              )
capacity; OFFICER CRAIG COX, in his             )
individual capacity; OFFICER STEVEN             )
MIZE, in his individual capacity; OFFICER )
THERESA LEONARD, in her individual              )
capacity,                                       )
           Defendants.                        )


**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT and
PLAINTIFF'S MOTION FOR ORAL ARGUMENT**

      This case arises out of an unfortunate series of events that culminated in the fatal

shooting by police officers of 42 year-old Stephen Todd Lee ("Lee").  Judith Kluesner, as

personal representative of the Estate of Stephen Todd Lee ("Plaintiff" or "Estate"), filed

this civil action against the City of Washington ("City"), Sergeant Richie Tolliver

("Sergeant Tolliver"), Sergeant Steven Mize ("Sergeant Mize"), Patrolman Craig Cox

("Officer Cox"), and Officer Theresa Leonard ("Officer Leonard") (collectively

"Defendants") under 42 U.S.C. § 1983 ("Section 1983"), alleging that Sergeant Tolliver,

Sergeant Mize, and Officer Cox used excessive force in attempting to apprehend Lee, and

that the City failed to properly train its officers to deal with emotionally disturbed and/or suicidal individuals. Plaintiff also brings state law claims for wrongful death, negligence, and failure to train. Defendants now move for summary judgment. For the reasons set forth below, the motion is **GRANTED in part and DENIED in part**.

## I.      Expert Report and Affidavit of Mr. Brian Clouse

Mr. Brian Clouse ("Clouse") is Plaintiff's police practice and policy expert. Defendants challenge his opinions contained in his expert report and in his affidavit. Thus, before addressing the facts of this case, the court must first determine whether the expert testimony of Clouse is admissible.

"Expert testimony on police practices and the use of force is, generally, admissible in a [Section] 1983 excessive force case." *White v. Gerardot*, 2008 WL 4372019, at *5 (N.D. Ind. Sept. 23, 2008) (quoting *McCloughan v. City of Springfield*, 208 F.R.D. 236, 239 (C.D. Ill. 2002) (citing *Calusinski v. Kruger*, 24 F.3d 931, 937 (7th Cir. 1994); *Kladis v. Brezek*, 823 F.2d 1014, 1019 (7th Cir. 1987)). Here, there is no dispute that Clouse has extensive academic and practical experience with law enforcement practices and is qualified to testify on these matters. Likewise, Clouse's testimony about proper police procedure and the use of force under the circumstances the officers encountered on the night of the shooting would assist the jury in determining whether the officers' actions were objectively reasonable.

However, an expert witness may not offer an opinion or legal conclusion on issues that will determine the outcome of the case. *Good Shepherd Manor Found., Inc. v. City*

*of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) ("The district court correctly ruled that expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible."); *White*, 2008 WL 4372019, at *5. In addition, an expert may not make credibility determinations, speculate on the evidence, provide irrelevant testimony, or otherwise give an opinion that will not assist the trier of fact to determine a fact in issue. *See, e.g., id.* at *6; *see also* FED. R. EVID. 702.

### A.     Expert Report

Here, Plaintiff seeks to use Clouse's report as evidence for the following: (1) the location of the cordless phone at the time of the subject shooting; (2) Lee's perceptions as to the officers' whereabouts immediately before the shooting, and Lee's mental state at the time of the shooting; (3) the direction of the muzzle flash at the time Lee discharged his weapon; (4) his opinion as to the reasonableness of the officers' use of deadly force; (5) his opinion on matters unknown to the officers (such as the fact that Lee was intoxicated at the time of the shooting); and (6) the credibility of the officers' testimony. The court will discuss these objections seriatim below.

### 1.     The Location of the Cordless Phone

At the time Sergeant Tolliver first observed Lee in the back yard, Lee was holding a cordless phone. It has subsequently come to light that Lee was unable to contact his girlfriend, and so at least some of the events at issue in this case were recorded on her voicemail. Based upon Clouse's observation that the volume levels were constant throughout the recording, he infers that had the phone been dropped, as Sergeant Tolliver

testified, the volume levels of the voices would have changed.

As discussed in the court's Entry below, the location of the cordless phone at the time of the shooting is an important piece of evidence for the Plaintiff. If it were in Lee's hand at the time Sergeant Tolliver first discharged his gun, then a reasonable juror could conclude that, contrary to Sergeant Tolliver's testimony, Lee did not pick up his weapon with both hands and point it in Sergeant Tolliver's location.

Clouse's testimony is not expert testimony. The jury can determine for itself, based upon the sound recording that is in evidence as Plaintiff's Exhibit 3, whether the phone was in a stationary position at the time of the shooting. Accordingly, his testimony as to the location of the cordless phone is stricken.

## 2. Lee's Perceptions

Clouse also testifies that it was highly unlikely that Lee knew that Sergeant Tolliver was present, and that there is "no way that Lee knew that [Sergeant] Mize and [Officer] Cox were on the other side of the residence until the shots were fired. Therefore, it is highly unlikely Lee was pointing the gun in anyone's direction." (Expert Report of Brian Clouse ("Clouse Report") at 18). Clouse also testifies, "Already in a mentally confused and intoxicated state, Mr. Lee likely had no chance to mentally process commands, or process WHO was commanding him, in order to react as the officers were directing. . . . The resulting confusion caused by the officers led to Lee not being able to conform to commands, leading officers to unreasonably shoot Lee." (*Id*. at 19).

These opinions are not based on facts, but on speculation. There is no way Clouse

could know Lee's perceptions or mental state immediately before and during the shooting incident. Accordingly, his opinion with respect to these issues are stricken.

### 3. Location of the Muzzle Flash

Clouse states that it is hard to conceive that an officer with night firing training and emergency response team training "could not ascertain the direction of a muzzle flash." (*Id*. at 25). Clouse testified that he has no experience with viewing the muzzle flash from a muzzle loading rifle at night, does not know how substantial the flash can be from a muzzle loading rifle depending on the amount of gunpowder used, and admits that the flash can reflect off of nearby objects. (Deposition of Brian Clouse ("Clouse Dep.") at 60-61). Clouse also ignores Sergeant Tolliver's testimony that he was not looking directly at Lee at the time Lee fired his weapon, but had taken momentary cover next to the neighbor's garage when he heard the shot and saw the light from the muzzle. (Deposition of Richie Tolliver ("Tolliver Dep.") at 131-32). In sum, Clouse's testimony is speculative, and not helpful to the jury. Accordingly, his testimony regarding the direction of the muzzle flash is stricken.

### 4. Opinions as to Use of Force

Clouse testified that he believes "both [Officer] Cox and [Sergeant] Mize heard [Sergeant] Tolliver's gunshots and automatically began firing in reaction to those shots, rather than as any reaction to what they allege as Lee's actions. Considering these factors, this shooting is unreasonable." (*Id*. at 26). He repeats his opinion that the shooting was "unnecessary and unreasonable," in other portions of his report. (Clouse

Report at 24, 28). As noted above, an expert's opinion that a defendant law enforcement officer used unreasonable or unnecessary force is an impermissible legal conclusion and should be excluded. *Good Shepherd*, 323 F.3d at 564; *White*, 2008 WL 4372019, at *5. Accordingly, Clouse's opinions on the ultimate issue to be decided in this case are stricken.

### 5.    Reliance on Facts Unknown to the Officers

Clouse also states that "[b]ased upon my review of the facts and issues at hand, it is apparent that a mentally unstable and intoxicated individual was trying to feign suicide in order to scare his girlfriend [Jamie Hammack]." (Clouse Report at 28). He bases that opinion on matters that were discovered only after the shooting and were not known to the officers on the scene, including the fact that Lee had threatened suicide before, that he wanted to get back in Jamie Hammack's ("Hammack") good graces, that Lee and his daughter had no place to live, and that this might be the best way to get Hammack's attention. (Clouse Dep. at 63-64). This opinion is irrelevant to the issue of whether the officers, based on the circumstances known to them at the time of the shooting, acted reasonably. *See Scott v. Edinburgh*, 346 F.3d 752, 756 (7th Cir. 2003) (finding that the use of force must be evaluated "in light of the facts and circumstances confronting [the officers]," "rather than with the 20/20 vision of hindsight."). Accordingly, Clouse's opinion on these issues is stricken.

### 6.    Credibility of Officers

Clouse concludes his report with this statement: "Further, it appears some facts

and scenarios by [Sergeant] Tolliver and [Sergeant] Mize, as well as [Officer] Cox, may have been invented to resolve and justify an otherwise unreasonable use of force against Stephen Todd Lee." (Clouse Report at 28). Clouse bases this statement on the officers' slightly differing testimony about where Lee held his gun (waist or chest area), that Cox is not sure whether he heard Sergeant Tolliver identify himself as a police officer, testimony about the direction Lee turned and whether Lee stumbled backwards as he turned. (Clouse Dep. at 65-67). While an expert is free to explain the conclusions he draws from the evidence, he may not opine as to whether or not he believes that the officer's prior statements and/or testimony is credible. *Good Shepherd*, 323 F.3d at 564; *White*, 2008 WL 4372019, at *6; *see also Richman v. Sheahan*, 415 F.Supp.2d 929, 941-42 (N.D. Ill. 2006). This portion of Clouse's Report is also stricken.

### B. Clouse's Affidavit

#### 1. Paragraph 2

In Sergeant Tolliver's deposition, he did not discuss the presence of a large bush next to the chain link fence where he first observed Lee. Clouse testified, in paragraph 2 of his affidavit, that he found this omission "significant, as it is unimaginable that a police officer would not recall or notate the presence of this large of a bush that could cover the officer's presence or hinder the tactical observations or operations of the officer." When asked about the bush in his deposition, Sergeant Tolliver testified that there was a bush next to the fence, and he identified the bush in a photograph. (Tolliver Dep. at 166-67; Tolliver Dep. Ex. 15). Sergeant Tolliver has never denied the presence of the bush.

Clouse's testimony attacking Sergeant Tolliver's honesty and credibility in this regard is inadmissible and therefore, stricken.

### 2.     Paragraph 7

Clouse testified that he performed a night time examination, and "ran the route" taken by Sergeant Mize and Officer Cox. After his examination, he opined that Sergeant Mize and Officer Cox "could not have had the amount of time necessary to 1) identify a threat, 2) verbally order a suspect to drop their weapon, and 3) target and fire their weapons." (Affidavit of Brian Clouse ("Clouse Aff.") ¶ 7). It is undisputed that Sergeant Mize and Officer Cox did not identify themselves as officers, or verbally order Lee to drop his weapon. Thus, this testimony does not aid the trier of fact to determine a fact in issue, and it is therefore stricken.

### 3.     Paragraph 8

Clouse testifies that although it is "nearly impossible to confirm the exact shooting sequence . . . including the fatal shot to Mr. Lee's back . . . at no time was Mr. Lee ever facing any of the three officers involved in the shooting, when he was struck by the fatal shot." (*Id.* ¶ 8). Clouse's testimony is purely speculative. The fact that Lee was shot in the back does not necessarily require a finding that Lee never faced any of the officers. Accordingly, this testimony is stricken.

### 4.     Paragraph 10

Clouse presents testimony on the results of his "test firing" of the muzzle loader. (*Id.* ¶ 10). Clouse testified, however, that he has never loaded or fired a muzzle loading

rifle before he performed the tests he testifies about. (Second Deposition of Brian Clouse ("Clouse Dep. 2") at 20). Clouse has had no training or education on how to test weapons to determine from what distance they were fired, but instead relies upon "common sense." (*Id*. at 19). Clouse learned how to load the muzzle loader via an internet search engine, conversations with co-workers, and a discussion with an unidentified sales clerk at a gun store. (*Id*. at 20-22, 24). He used two commonly utilized measures of gunpowder during his test fire, 50 grains and 100 grains, but he does not know the granulation of the gunpowder he used for his test fire. (Clouse Dep. 2 at 23-24). Moreover, Clouse did not replicate Lee's use of the gun as he failed to utilize any ammunition in the gun, but instead relied solely on gunpowder, and he fired the gun into white cardboard instead of grass. (Clouse Dep. 2 at 24, 26). The court finds that Clouse does not have the expertise to testify about the test fires he describes and depicts in his affidavit and the exhibits thereto. Accordingly, this testimony as to this matter is stricken.

## II.     Oral Argument

Plaintiff moves for oral argument "to help the Court determine which facts are disputed and which are undisputed." (Plaintiff's Motion at 1). The court is able to ascertain which facts are disputed and which are not disputed from the designated evidence submitted by the parties. Accordingly, Plaintiff's motion is **DENIED**.

## III.     Summary Judgment Standard

Summary judgment is proper where "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  A genuine issue of material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  Some alleged factual dispute that does not rise to a genuine issue of material fact will not alone defeat a summary judgment motion. *Id*. at 247–48.

In deciding whether a genuine issue of material fact exists, the court views the evidence and draws all inferences in favor of the nonmoving party. *Miranda v. Wis. Power & Light Co.*, 91 F.3d 1011, 1014 (7th Cir. 1996).  However, when a summary judgment motion is made and supported by evidence as provided in Rule 56(c), the nonmoving party may not rest on mere allegations or denials in its pleadings but "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).  If the nonmoving fails to present a genuine issue of material fact bearing on the issues in the case, summary judgment is mandated. FED. R. CIV. P. 56(c).

## IV.    Factual Background

### A.    Facts Related to Plaintiff's Excessive Force and State Law Claims

On the afternoon of September 7, 2008, Lee and his girlfriend, Hammack, had an argument over his refusal to babysit Hammack's three children.  (Deposition of Jamie Hammack ("Hammack Dep.") at 29).  That evening, Hammack told Lee that she wanted him out of her house.  (*Id*. at 35).  Around 5:00 p.m., he began drinking alcohol at the bar

where Hammack worked as a bartender. (*Id*. at 32-33). He left, returned once, and then stayed until sometime before 11:00 p.m., when he went to his father's (also named Stephen Lee) house located at 2006 Grand Avenue, Washington, Indiana. (*Id*. at 35-37). Lee's father was not in town that evening. (Deposition of Stephen Lee, Sr. ("Lee Sr. Dep.") at 47). Lee had two daughters at the time of his death, including one that was living with him but had not grown up in his household, and a daughter in her 20s with whom he was not in contact. (*Id*. at 27; Lee Sr. Dep. at 7, 31-34).

Lee texted Hammack around 11:00 p.m. from his cellular phone asking if he could come home, and Hammack responded, "No." (Hammack Dep. at 35-36). The two spoke via their cell phones and Lee complained that he and his daughter had no place to live, that he wanted to kill himself, and hung up. (*Id*.). Lee then called Hammack from the phone at his father's house and told her that he was going to kill himself, that he was done "dealing with things," and was going to put a bullet in his head. (*Id*. at 36). Hammack hung up, but Lee called her back and told Hammack that he wanted her to listen to him kill himself. (*Id*. at 36-37). After that call, Lee called Hammack from his father's phone (a number Hammack recognized) and repeated that he wanted her to listen to him blow his head off. (*Id*. at 37). Lee had been having financial problems because he was not working, was depressed about the death of his mother that January, and was losing his truck and his motorcycle due to his failure to make payments. (*Id*. at 14-15, 17-18; Lee Sr. Dep. at 26, 28-29). Lee had been drinking heavily at least five times a week during the summer of 2008. (Hammack Dep. at 20-22). Lee had told Hammack in the past that

11

he wanted to kill himself but that he was "too afraid" to actually do it. (*Id*. at 38).

Hammack had never called for help about Lee's talk of suicide before, but because he

was being so persistent that night, she called 911. (*Id*. at 39).

Hammack called 911, and the call was received by Officer Leonard, employed by

the City of Washington as a dispatcher for over three years. (Deposition of Theresa

Leonard ("Leonard Dep.") at 22). The call included the following exchange ("D" is

dispatcher; "H" is Hammack):

D:     911, what's the address for your emergency?

H:     Um, the address would be two thousand six Grand Avenue.

D:     Ok, what's the problem?

H:     Um, my boyfriend, Steve Lee, is over at his father's house, uh, threatening

to put a bullet in his head, I don't know if it's true or not, but . . .

D:     OK, who'd you hear this from . . . what's . . .

H:     Uh, he called me from his dad's house.

D:     Steve Lee did?

H:     Yes.

D:     And, his dad's house is two thousand six Grand Avenue?

H:     Yes ma'am.

D:     And he's over there threatening to put a bullet in his . . . ok. Who's his

dad?

H:     Ok, his name's . . . .

D:    Ok, you cut out on me.  His name's what?

H:    Steve Lee as well.

D:    Ok.  And your name?

H:    My name's Jamie Hammock.

D:    Ok.  Ok, well we'll get officers over there.

H:    Thank you.

D:    Thank you.  Um bye.

H:    Bye bye.

(Defendant's Ex. D; Leonard Dep. at 55; Leonard Dep. Ex. 32).  Leonard noted her activities concerning the Hammack 911 call in a report.  (Defendants' Ex. E; Leonard Dep. at 56, 57, 59, 60; Leonard Dep. Ex. 31).  The 911 call was received by Leonard at 12:09 a.m. on September 8, 2008.  (Defendants' Ex. E; Leonard Dep. at 56, 59; Leonard Dep. Ex. 31).

Immediately after receiving the call, Leonard told, in person, Sergeant Tolliver, Sergeant Mize, and Officer Cox of the Washington Police Department ("WPD") (who were at the station due to a recent shift change), about the call.  (Leonard Dep. at 66).  It was unclear to Officer Leonard and the other officers at the time whether Lee intended to shoot his father or himself.  (Leonard Dep. at 65, 68; Tolliver Dep.) at 97-98; Deposition of Steve Mize ("Mize Dep.") at 83; Deposition of Craig Cox ("Cox Dep.") at 31).  At Sergeant Tolliver's direction, she also attempted to contact someone at the Grand Avenue address via its land line, but that phone was busy.  (Leonard Dep. at 69-71).

The officers drove separately to the Grand Avenue address, which was only a few minutes away from the station. (Tolliver Dep. at 99; Mize Dep. at 84). Via cell phone, the officers discussed parking their cars away from the house and walking to the house. (Tolliver Dep. at 99-100; Mize Dep. at 84). As the officers walked to the house, they discussed how they would physically approach the house and that they needed to be sure the house was secure. (Tolliver Dep. at 106, 108-09; Mize Dep. at 87; Cox Dep. at 50). A motorcycle and a truck were located in the driveway of Stephen Lee Sr.'s house. (Cox Dep. at 43). Sergeant Tolliver walked to the west side of the house. (Tolliver Dep. at 106, 108; Mize Dep. at 87; Cox Dep. at 50). Officer Cox and Sergeant Mize approached the front door of the house, where Sergeant Mize looked in a front window while Officer Cox knocked on the front door. (Mize Dep. at 88-90; Cox Dep. at 44). There was no response to Officer Cox's knock. (Mize Dep. at 91).

As Sergeant Tolliver walked the side of the property along a split rail fence, he reached the neighbor's garage and looked over a chain link fence into Steven Lee Sr.'s backyard. (Tolliver Dep. at 109-10). A tall bush was in full bloom against the chain link fence, leaving a narrow view of the backyard. (*See* Plaintiff's Ex. 15; Defendants' Ex. D (to Reply Brief)). A large security light lit the property. (Tolliver Dep. at 112). Sergeant Tolliver saw Lee, who he knew from investigating various complaints in the past. (*Id*. at 86-87, 113). Sergeant Tolliver stepped back, took cover by a garage, and radioed to Officer Cox and Sergeant Mize that there was a man in the backyard with a gun. (*Id*. at 114). Sergeant Tolliver stepped forward again and shined his flashlight on Lee. (*Id*. at

14

116). He saw Lee partially bent over with what he believed to be a shotgun (later determined to be a single shot muzzle loader) resting against his hip or stomach with its barrel on the ground. (*Id*. at 117). Lee was facing north towards the alley behind the house. (*Id*. at 120). Sergeant Tolliver also saw that Lee had something in his hand; Sergeant Tolliver was not sure what it was but believed it to be a phone because the object was lifted to Lee's ear. (*Id*. at 117-18).

As it turns out, Lee was on a cordless phone at this critical time trying to contact Hammack. Because Lee was unable to contact her, at least a part of the police encounter with Lee was recorded on her voice mail. Timothy P. Maher of Wolf Technical Services transcribed the voice mail as follows:

00:00:03.3 - 00:00:08.5 "First saved message, sent yesterday at 11:16 p.m."

00:00:12.7 - 00:00:13.7 "Put it down."

00:00:13.9 - 00:00:14.9 "Put it down."

00:00:15.9 - 00:00:16.5 "(Inaudible)"

00:00:18.5 - 00:00:19.3 (One apparent gun shot)

00:00:19.5 - 00:00:21.2 "Put it down Steve."

00:00:21.2 - 00:00:26.5 (six apparent gunshots in sequence).

00:00:26.8 - 00:00:27.8 "(Inaudible) Why you shootin' me?"

00:00:27.3-00:00:27.9 (One gunshot) Overlaps with above line.

00:00:29.4 – 00:00:30.5 "Stop (inaudible)."

00:00:31.1 - 00:00:32.9 "(Inaudible) Roll EMS right now (inaudible)."

00:00:34.8 - 00:00:35.8 "(Inaudible) Shots fired."

00:00:38.9 - 00:00:42.9 "End of message, to delete this message, (beep) resaved, end of messages."

(Affidavit of Timothy Maher ("Maher Aff."), Ex. A).

The court has listened to the voice mail, which is in evidence on a compact disk as Plaintiff's Exhibit 3. Based purely upon the sound of the recording, a reasonable juror could conclude that the phone was either on the ground at the time the voice mail began to record, as Defendants contend, or it was in Lee's hand at the time the voice mail began to record, as the Plaintiff contends.

Sergeant Tolliver testified that after he identified himself as a police officer, Lee turned his head, looked at him, and dropped what he believed to be the phone, on the ground. (Tolliver Dep. at 121-23, 128; *see also* Cox Dep. at 47-48 (testifying that he heard Sergeant Tolliver say, "Police department. Drop your gun."). After yelling to Lee to drop the gun several more times, Lee stood up, picked up the gun in both hands, and brought it to his waist as he turned towards Sergeant Tolliver. (*Id*. at 123-25, 130). Sergeant Tolliver testified that he took partial cover at the corner of the neighbor's garage. (*Id*. at 130-31). When he did, he heard Lee fire his gun and saw the gun's muzzle flash. (*Id*. at 131-33). It was at this time, after he saw Lee's gun go off, that he stepped forward and fired one shot at Lee over the chain link fence. (*Id*. at 135). Sergeant Tolliver testified that he shot at Lee two more times because he believed that Lee was pointing the shotgun towards Sergeant Mize and Officer Cox (who, at this time,

ran around the other side of the house). (*Id*. at 140; Mize Dep. at 93-95; Cox Dep. at 47, 57, 65, 67-68). If the phone was still in Lee's hand during this critical time period, then it is unlikely that Lee could have picked up the shotgun with both hands, as Sergeant Tolliver testified, and fired the shotgun.

Moreover, it is unclear, based upon the contents of the voice mail, the point in time in which the voice mail began to record. Defendants contend that it began to record after Sergeant Tolliver identified himself as a police officer and asked him to put the gun down. Plaintiff, on the other hand, contends that the voice mail is evidence that Sergeant Tolliver did not identify himself to Lee before he shot him.

Sergeant James Dotson of the Indiana State Police ("ISP"), who conducted a post-shooting investigation of the scene, testified that the muzzle loader was fired into the ground. (Deposition of James Dotson ("Dotson Dep." at 19). This is also reflected on the maps drawn by the ISP and relied on by Defendants, which show the burn mark in the ground from the gun discharge directly next to where Lee would have been standing at the time. (Dotson Dep. Exs. at 3-4). This evidence, if believed, could cause a jury to question Sergeant Tolliver's testimony that the gun was at Lee's waist when he fired. It could also cause a jury to question Sergeant Tolliver's testimony that Lee turned the gun toward Sergeant Mize and Officer Cox before he (Sergeant Tolliver) fired his weapon two more times.

At this time, as noted above, Sergeant Mize and Officer Cox were on the other side of the house, against a chain link fence. (Mize Dep. at 100). Officer Cox testified that

they "heard there was a threat in the back of the yard," so they ran along the east side of the house and stopped at the chain link fence. (Cox Dep. at 57-58). Sergeant Mize arrived at the chain link fence first. (*Id*. at 60).

Sergeant Mize corroborates Sergeant Tolliver's testimony that Lee held the gun in both of his hands, raised the gun to his waist or chest area, and pointed the gun away from Lee's body. (Mize Dep. at 102 (testifying that Lee held the gun with both hands at chest level); Cox Dep. at 70 (testifying that Lee held the gun at waist level, but not "100% sure" if holding gun with both hands)). Sergeant Mize and Officer Cox further corroborate Sergeant Tolliver's testimony that Lee turned toward them with a weapon in hand, although Sergeant Mize could not say whether the shotgun was actually pointed at him (Mize Dep. at 106; Cox Dep. at 70). Sergeant Mize fired two shots at Lee (at roughly the same time as Sergeant Tolliver). (Mize Dep. at 108; Cox Dep. at 74-75). Lee fell backwards, and Sergeant Mize then told Officer Cox to stop firing because Lee had dropped his weapon. (Mize Dep. at 109-10; Cox Dep. at 76). Sergeant Mize and Officer Cox jumped the chain link fence and Sergeant Mize immediately (12:15 a.m.) called Officer Leonard to dispatch an ambulance and EMS team. (Mize Dep. at 110; Cox Dep. at 78-79; Leonard Dep. at 56, 79; Leonard Dep. Ex. 31).

Sergeant Mize approached Lee to make sure he was no longer armed. (Mize Dep. at 111). He and Sergeant Tolliver then went to check the home for any potential victims while Officer Cox stayed with Lee. (Tolliver Dep. at 142-44; Cox Dep. at 81). Officer Cox and Sergeant Tolliver were aware that Lee suffered a gun shot wound to the chest

and was not moving.  (Tolliver Dep. at 148, 151; Cox Dep. at 81).

Officer Leonard dispatched EMS (at 12:16 a.m.) and the Washington Fire

Department (at 12:17 a.m.), and then made calls to various law enforcement officers to go

to the scene.  (Leonard Dep. at 79-80).  When Washington Police Chief Steve Riney

arrived at the scene, he asked the ISP to investigate the shooting.  (Deposition of Steve

Riney ("Riney Dep.") at 71).  EMS attended to Lee at the scene, found that he had no

pulse and no respiration, began CPR and were on route to the hospital by 12:36 a.m.

(Mize Dep. at 116-17; Deposition of Shauntri Robertson at 19, 22; Leonard Dep. at 82).

Lee did not survive his injuries.  He was shot two times, once in the sternum, which

entered from the back and exited through the front (this was the lethal shot) and once in

the right lower side of his waist, where the bullet embedded.  (Deposition of James

Jacobi, M.D., at 40-42).  Lee's cause of death was determined to be exsanguination due to

gunshot wound with penetration of right lung, superior vena cava and ribs.  (*Id*. at 55, 59).

Lee's blood alcohol content at the time of the autopsy was .22%.  (*Id*. at 42).

The post-shooting investigation by the ISP revealed that Lee's shotgun was a

single shot muzzle-loading rifle that he kept at the Grand Avenue address.  (Lee Sr. Dep.

at 41).  In addition to the shot that Lee fired from that weapon into the ground, (Dotson

Dep. at 19), six fired casings were found in the areas where the officers reported firing

their guns.  (*Id*. at 21).

## B.  Facts Related to the Officers' Training

The officers all attended and graduated from the Indiana Law Enforcement

Academy ("ILEA"), whose curriculum includes training on suicidal individuals and hostage situations as well as training concerning the use of firearms in low light conditions. (Tolliver Dep. at 26, 41-42, 68; Mize Dep. at 31-33, 67-68; Cox Dep. at 25, 30). The officers received the required 16 hours of training per year as mandated by state statute in 2008 (which has since been amended to 24 hours). (Deposition of Timothy Guy ("Guy Dep.") at 23-24). The officers also receive firearms training and are required to qualify on a shooting course with their issued hand guns at least once a year. (*Id*. at 14). All WPD officers comply with the continuing education requirements imposed by statute, and if an officer wants to attend additional training, he can get permission to do so from the Chief of Police. (*Id*. at 23-24).

The City's policies and procedures are outlined in a document entitled "Policies and Procedures." (Plaintiff's Ex. 13, Washington Police Department Policies and Procedures). Section 14 is entitled "Suicide and Hostage Conditions." (*Id*. at 23). The following section is entitled "Use of Deadly Force." (*Id.*at 24).

Between September 22, 2005, and May 31, 2009, the City dispatched officers to respond to 911 calls reporting suicidal individuals approximately 21 times. (Plaintiff's Ex. 12, City's Answers to Interrogatories, No. 10). These reports reflect that the majority of the suicide attempts involved the ingestion of prescription drugs. There was one report of a man threatening to shoot himself, and another of a man threatening suicide who had a gun in the apartment. Lee's death, however, was the first police shooting fatality in Washington for at least 27 years. (Deposition of Steven Riney ("Riney Dep.") at 97-98).

All other facts necessary to a determination of the Plaintiff's claims will be addressed in
Section V. Discussion.

**V.      Discussion**

    **A.      Section 1983 Claims**

Plaintiff brings two federal civil rights claims under Section 1983.  That section
provides a private cause of action against a person, who, acting under color of state law,
deprives an individual of any "rights, privileges, or immunities secured by the
Constitution and laws" of the United States.  *Livadas v. Bradshaw*, 512 U.S. 107, 132
(1994) (quoting 42 U.S.C. § 1983).  "Section 1983 is not itself a font for substantive
rights; instead it acts as an instrument for vindicating federal rights conferred elsewhere."
*Spiegel v. Rabinovitz*, 121 F.3d 251, 254 (7th Cir. 1997).

The issues of constitutional import in this case surround Lee's shooting.
Specifically, in Count I, Plaintiff alleges that Sergeant Tolliver, Sergeant Mize, and
Officer Cox violated Lee's Fourth Amendment right against the use of excessive force,
and in Count II, Plaintiff alleges that the City's failure to train its officers evidenced
deliberate indifference to Lee's rights.  Defendants contend that Sergeant Tolliver,
Sergeant Mize, and Officer Cox are entitled to qualified immunity, that the amount of
force utilized by the officers was reasonable under the circumstances, and that the training
provided by the City was constitutionally adequate.

        **1.      Excessive Force (Count I)**

The Fourth Amendment provides: "The right of the people to be secure in their

persons . . . against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. An officer's use of deadly force is a "seizure" within the meaning of the Fourth Amendment and thus, is constitutional only if it is reasonable. *Tennessee v. Garner*, 471 U.S. 1, 7 (1985); *Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002). An officer may use deadly force "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm . . . ." *Scott*, 346 F.3d at 756 (quoting *Garner*, 471 U.S. at 11-12). Whenever possible under the circumstances, an officer should identify himself as a law enforcement officer to the suspect. *Garner*, 471 U.S. 11-12. The determination of whether an officer used excessive force is a fact-specific inquiry and thus, depends on the totality of the circumstances surrounding the encounter. *Scott*, 346 F.3d at 756 (citing *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 592 (7th Cir. 1997)).

The issue of whether an officer's use of deadly force is reasonable is measured under an objective reasonableness standard. *Id*. (citing *Graham v. Connor*, 490 U.S. 386, 399 (1989)). An officer's determination of the appropriate level of force to use "is judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. (citing *Graham*, 49S. at 396). Moreover, the reasonableness inquiry must allow "for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id*. (citing *Graham*, 490 U.S.

at 396-97); *see also DeLuna v. City of Rockford, Ill.*, 447 F.3d 1008, 1010 (7th Cir. 2006); *Sherrod v. Berry*, 856 F.2d 802, 805 (7th Cir. 1988) ("Knowledge of facts and circumstances gained after the fact (that the suspect was unarmed) has no place in the trial court's or jury's proper post-hoc analysis of the reasonableness of the actor's judgment."). "Thus, 'when an officer believes that a suspect's actions [place] him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force.'" *Muhammed*, 316 F.3d at 683 (quoting *Sherrod*, 856 F.2d at 805).

The facts known to the officers at the time of the events in question were that Lee was threatening to put a bullet in his head or in his father's head. Based upon this information, the officers were justifiably on high alert with their guns drawn. What occurs next is subject to dispute, and turns on a few key pieces of evidence. The first of these is the location of the phone receiver at the time the events in this case transpired. If, as the Plaintiff contends, the receiver was in Lee's hand during the entire altercation, then it is highly unlikely that he was able to pick up the gun with both hands and aim it at Sergeant Tolliver, as Sergeant Tolliver contends. Second, the location of the shot fired by Lee indicates that when he released the trigger, the gun was pointing down, and not at Sergeant Tolliver. As this was the first shot fired, this is additional evidence supporting the Plaintiff's case that Lee did not point the gun at Sergeant Tolliver before Sergeant Tolliver fired his weapon. These facts are material because, if believed, a reasonable jury could question the veracity of Sergeant Tolliver's statement that, after commanding Lee

to put the gun down, Lee ignored his requests, picked up the gun with both hands, and pointed it at Sergeant Tolliver, threatening his life.  A final piece of evidence favoring the Plaintiff's case is the voice mail recording of the incident, which reflects that the shots were fired in rapid succession.  Given this evidence, a reasonable jury could question the veracity of the testimony of all three officers, as they testified that after a few shots were fired, Lee turned his body such that he was pointing the gun toward Sergeant Mize and Officer Cox, who were located on the other side of the house (behind the chain link fence).  The sound of the shots fired was so rapid, that a reasonable juror could believe that Lee did not have the time to stand up with a gun, much less turn toward Sergeant Tolliver, and then change his stance and turn toward Sergeant Mize and Officer Cox with his gun pointing in their direction.  In sum, if Lee did not point the gun at the officers, then there is an issue of material fact as to whether Lee posed an immediate threat to their safety, thus justifying the use of deadly force.

On the other hand, Sergeant Tolliver saw Lee in the backyard with what he believed to be a shotgun, and ordered him to put the gun down at least three times in a very loud and commanding voice.  Sergeant Tolliver saw Lee stand up with the gun in his hands, and turned towards him.  Sergeant Tolliver then took cover behind the neighbor's garage. Sergeant Tolliver testified that he then saw the light of the gunfire after Lee fired the gun.  After seeing that, Sergeant Tolliver fired his gun a total of three times.  During this time frame, Sergeant Mize and Officer Cox enter the scene from the other side of the house, believe Lee's gun is pointed at them, and fire their weapons as well.  Significantly,

the officers did not know that Lee was extremely drunk or that he was handling a single-shot muzzle loader.

As evidenced by the parties' conflicting accounts of the shooting, there exist genuine issues of material fact concerning the matters leading up to the shooting, and thus, whether the officers' actions were objectively reasonable in light of the facts and circumstances confronting them. Indeed, the reasonableness of the use of deadly force will likely turn on which version of the facts the trier of fact accepts. A reasonable jury could conclude that Lee never posed a threat to the officers' safety, and thus, the use of deadly force was unjustified. However, a reasonable jury could resolve all factual disputes in favor of the officers, and conclude that such force was objectively reasonable. Accordingly, the court finds an issue of fact as to whether Sergeant Tolliver, Sergeant Mize, and Officer Cox violated Lee's Fourth Amendment rights by utilizing deadly force.

### 2. Qualified Immunity (Count I)

Defendants assert that even if the officers used excessive force against Lee, they are shielded from liability by virtue of qualified immunity. A determination of qualified immunity must be made early in the litigation, as "[q]ualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'" *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Whether a defendant is entitled to qualified immunity requires a two-step[1] analysis. *Id.* at 201. First, the court

---

[1] In *Pearson v. Callahan*, – U.S. – , 129 S.Ct. 808, 818-22 (2009), the Supreme Court held that the *Saucier* test is not mandatory and that lower courts may decide, in their discretion,

must determine, considering the facts in the light most favorable to the plaintiff, whether the defendant's conduct violated a constitutional right. *Id.* If so, the court must determine whether the right that the defendant violated was clearly established at the time of the alleged injury. *Id.* Although the privilege of qualified immunity is a defense, Plaintiff carries the burden of defeating it. *Molina ex rel. Molina v. Cooper*, 325 F.3d 963, 968 (7th Cir. 2003).

In the present case, the court has already determined that, taking the facts in the light most favorable to the Plaintiff, a reasonable trier of fact could conclude that the officers' use of deadly force violated Lee's Fourth Amendment rights. Thus, the primary issue is whether the constitutional right allegedly violated was defined at the appropriate level of specificity at the time of the violation.

To be "clearly established," the right must be:

> sufficiently clear that a reasonable officer would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of the pre-existing law the unlawfulness must be apparent.

*Miller v. Jones*, 444 F.3d 929, 934 (7th Cir. 2006) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). In other words, the law is clearly established if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 201-02; *see also Wheeler v. Lawson*, 539 F.3d 629, 640 (7th Cir.

---

in which order to answer these two questions. Given the facts of the present case, the court elects to follow the *Saucier* approach.

2008) (finding that case law must give fair warning to a reasonable police officer that his conduct was unlawful in the situation he confronted). In determining whether a right is clearly established, the court is not limited to cases from the Supreme Court or the Seventh Circuit. *Donovan v. City of Milwaukee*, 17 F.3d 944, 952 (7th Cir. 1994).

Defendants did not provide the court with any analogous case law because, they say, there is no case law:

> that clearly established that a police officer cannot use deadly force when faced with an individual who has threatened violence with a gun, who is not contained and is capable of harming others, who points a firearm in the officers' direction, and who fires that weapon after having been told repeatedly to put the gun down.

(Defendant's Moving Brief at 15). Defendants define the issue based upon the facts in the light most favorable to them. As this case is before the court on a motion for summary judgment, the court must view the facts in the light most favorable to the Plaintiff. Thus, the issue must be framed as whether it was clearly established that it is unreasonable to use deadly force against a suicidal or otherwise mentally disturbed individual who possesses a weapon, but who does not pose an imminent threat, even if such individual fails to heed orders to drop his weapon.

Plaintiff relies on a number of cases, the most analogous of which is *Wallace v. Estate of Christopher Davies*, 676 N.E.2d 422 (Ind. Ct. App. 1997). In *Wallace*, the decedent, Christopher Davies, attempted to call his counselor at Trinity House because he wanted to kill himself. *Id.* at 424. Davies' counselor was not at the office, so Trinity House called the police department. *Id.* Several officers responded to the call. *Id.* The

officers arrived at Davies' apartment building and entered it to look for Davis' apartment. *Id*. at 424-25. One officer, Hartman, approached Davies' apartment while another, Wallace, stood in the open area. *Id*. at 425. Hartman slowly opened the door, and Davies emerged holding a shotgun "in an angled or port of arms[2] position." *Id*. Davies started to turn and lowered the angle of the gun, and Hartman shot and killed him. *Id*.

Davies' estate sued, alleging that the use of deadly force was unconstitutional. *Id*. The court denied defendants' motion for summary judgment, finding that the defendants were not entitled to qualified immunity. *Id*. The Indiana Court of Appeals affirmed the trial court, and, relying upon the Supreme Court's *Anderson v. Creighton* decision, found that "Davies' Fourth Amendment right – to be subject to a police officer's use of deadly force only to prevent serious bodily injury to the officer or a third person – was sufficiently clear so that a reasonable official would understand that what he is doing violates that right." *Id*. at 428.

Other cases from this and other jurisdictions similarly hold that the use of deadly force against an individual who poses no immediate threat to officers or others is unconstitutional. *See Mercado v. City of Orlando*, 407 F.3d 1152, 1156-61 (11th Cir. 2005) (holding that officer who intentionally fired a "Sage Launcher" at the head of an individual threatening suicide with a knife, causing serious permanent brain injury,

---

[2] "In a 'port of arms' position, the gun 'is held diagonally in front of the body so that the barrel is at the left shoulder.'" *Id*. at 426 (quoting *Webster's Third New Int'l Dictionary* 1768).

unconstitutionally used deadly force when plaintiff posed no immediate threat to others; law clearly established even without prior case law on point); *Russo v. City of Cincinnati*, 953 F.2d 1036, 1039-45 (6th Cir. 1992) (reversing district court's grant of qualified immunity to police officers who shot decedent, a suicidal paranoid schizophrenic carrying a knife, after they unsuccessfully attempted to subdue him with a Taser; question of fact existed as to whether decedent posed a serious threat of physical harm); *Quade v. Kaplan*, 2008 WL 905187, at *8 (N.D. Ill. March 31, 2008) (denying qualified immunity to officer on excessive force claim; dispute of fact existed as to whether plaintiff threatened officer with his car before officer fired into the back of plaintiff's car as he drove away, striking plaintiff). *Cf. Holzman v. City of South Bend*, 2006 WL 2788587, at *4 (N.D. Ind. Sept. 25, 2006) (holding that use of Taser against potentially suicidal individual who threatened "to do a suicide by cop" if police entered his apartment, but did not resist when officers attempted to detain him, was unreasonable).

Viewing the facts in the light most favorable to the Plaintiff, the court finds that these cases provided the officers with fair warning that their actions on the evening of September 8, 2008, were unlawful. Accordingly, the court finds that the officers are not entitled to the defense of qualified immunity. Defendants' Motion for Summary Judgment on Plaintiff's claim of excessive force is therefore **DENIED**.

### 3. Failure to Train (Count II)

Plaintiff asserts that the WPD (*i.e.*, the City) had in place municipal policies, customs, or practices that caused its police officers to be inadequately trained. The WPD

may be liable for failing to train its police officers only if "the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Deliberate indifference can be shown "when [a municipality] fails to train its employees to handle a recurring situation that presents an obvious potential for a constitutional violation and this failure to train results in a constitutional violation." *Dunn v. City of Elgin*, 347 F.3d 641, 646 (7th Cir. 2003) (quoting *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 409 (1997)). Alternatively, "a municipality shows deliberate indifference if it fails to provide further training after learning of a pattern of constitutional violations by the police." *Id.* (quoting *Palmquist v. Selvik*, 111 F.3d 1332, 1346 (7th Cir. 1997). "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality – a 'policy' as defined by our prior cases – can a city be liable for such a failure under [Section 1983]." *City of Canton*, 489 U.S. at 389. In sum, to successfully allege a failure to train Section 1983 claim, the policymakers must have "actual or constructive notice that a particular omission is likely to result in constitutional violations." *Cornfield by Lewis v. Consolidated High Sch. Dist. No. 230*, 991 F.2d 1316, 1327 (7th Cir. 1993); *see also Dunn*, 347 F.3d at 646 ("Plaintiffs had to show that the City was aware that unless further training was given, the officers would undermine the constitutional rights of others.").

Plaintiff argues that this case presents a "recurring situation that presents an obvious potential for a constitutional violation." *Dunn*, 347 F.3d at 646 (quoting *Brown*, 520 U.S. at 409). In support of this claim, Plaintiff presents evidence, through the City's

911 dispatch reports, that calls reporting potential suicides are not uncommon in the City

of Washington – roughly 21 in a four year time span. (*See* Plaintiff's Ex. 12, City's

Answers to Interrogatories, No. 10).  The 911 dispatch reports reveal, however, that 19 of

the 21 suicide calls did not even mention a gun, and that most of these calls involved

actual or potential overdoses.  (*Id*.).  Moreover, there is no evidence of police misconduct

in any of the 911 dispatch reports.  Without such prior misconduct, the WPD was not put

on notice that it should have been training its officers to interact with suicidal individuals

any differently than how its officers were trained at the ILEA or at continuing education

seminars which address the issue of suicide.

Plaintiff's police practice and policy expert, Clouse, opines that had the City

adopted a Crisis Intervention Team ("CIT"), like the City of Memphis and the City of

Indianapolis[3] have recently done to great success, "officers could have acted reasonably

by resorting to levels of force from less than lethal to mere conversation."  (Clouse Report

at 16-17).  In sum, Plaintiff argues that the officers' training should have been "better or

more."

In *Palmquist*, the Seventh Circuit rejected the plaintiff's argument that "no special

training = deficient training."  111 F.3d 1332, 1345 (7th Cir. 1997).  The Court held that

_____

[3] Interestingly, Clouse admits that CIT may not be as effective in smaller jurisdictions "because the volume of such situations could be limited, as well as the smaller number of available personnel."  (Clouse Report at 17).  Sergeant Tolliver testified that the City's police force consisted of only 14 or 15 officers at the time of the shooting.  (Tolliver Dep. at 77).  Thus, even Clouse must admit that adopting a CIT program in Washington, Indiana, may not be a feasible proposition.

evidence showing that a police department complied with the state's minimum standards for training police officers regarding abnormally acting individuals, coupled with evidence that the officers involved received such training, barred any finding that a city's policymakers were deliberately indifferent. *Id.* Citing the Supreme Court's *City of Canton* decision, the Seventh Circuit held that the plaintiff's "better or more" training argument had the potential to subject police departments to unnecessary litigation. *Id.* "To conclude otherwise would be to subject all municipalities which employ police officers who attended [state mandated training] to liability for 'inadequate' training in handling abnormally behaving individuals." *Id.* While it is possible that a state's minimum standards do not adequately address a particular area of training, compliance by a municipality with state training standards defeats any possibility that a reasonable jury could uphold a charge of deliberate indifference. *Johnson v. City of Milwaukee*, 41 F.Supp.2d 917, 931 (E.D. Wis. 1999).

Here, the City has provided training to its officers, through the ILEA and locally, on not just the operation of firearms, but when to use and not to use their guns. The officers have all received "shoot/don't shoot" training via a simulator at both the ILEA and when the simulator was borrowed and brought to the City for the officers' use. (Tolliver Dep. at 43; Mize Dep. at 67-68; Cox Dep. at 50-51; Guy Dep. at 14). They have also trained with the emergency response team for their area, learning techniques to use during hostage situations and building entrances. (Tolliver Dep. at 44-46; Mize Dep. at 58, 61; Cox Dep. at 25, 30). As the City has provided the state mandated requirements

for training for suicide and/or hostage situations, the Plaintiff's "better or more" argument must be rejected.

Finally, Plaintiff suggests that the City's policy on dealing with suicidal individuals is itself deficient because the City's Policies and Procedures discusses both suicide and hostage situations in Section 14, and because that section is followed by the City's policy on the use of deadly force. Plaintiff fails to provide evidence upon which a jury could determine that the City's written policy on suicidal individuals is likely to lead to constitutional violations. It provides no alternatives, nor suggestions of what a more "constitutional" policy would be, for dealing with suicides. Moreover, the physical placement of the policy in the City's Policies and Procedures, as preceding the City's policy on the use of deadly force, cannot be relied upon to hold the City liable for an unconstitutional "policy or practice" as Section 14 concerning Suicide and Hostage Conditions is clearly separated from Section 15 concerning the Use of Deadly Force, and neither section references the other. For these reasons, the court finds that the evidence does not support a finding that the City was deliberately indifferent to the training of its law enforcement officers.

**B.     State Law Claims**

**1.     Indiana Tort Claims Act**

**a.      Individual Capacity Claims**

Plaintiff also brings pendant state law tort claims for wrongful death, negligence, and failure to train. The Indiana Tort Claims Act ("ITCA"), Indiana Code § 34-13-3-1 *et*

*seq*., governs lawsuits against political subdivisions and their employees. "Among other things, the ITCA provides substantial immunity for conduct within the scope of the employee's employment." *Bushong v. Williamson*, 790 N.E.2d 467, 472 (Ind. 2003). "The purpose of immunity is to ensure that public employees can exercise their independent judgment necessary to carry out their duties without threat of harassment by litigation or threats of litigation over decisions made within the scope of their employment." *Id*. (internal quotations and citations omitted).

Here, Plaintiff's Complaint alleges that the officers, including Officer Leonard, acted within the scope of their employment. The ITCA bars individual claims against governmental employees acting within the scope of their employment. Ind. Code § 34-13-3-5(b). Accordingly, Plaintiff's state law tort claims are barred against them personally. The court now turns to the issue of whether the ITCA provides governmental immunity to the City for the alleged torts committed by these officers.

### b. Immunity Under Indiana Code § 34-13-3-3(19)

The City contends that Officer Leonard is immune from liability pursuant to Indiana Code § 34-13-3-3(19), which provides that:

A governmental entity . . . is not liable if a loss results from the following:

* * *

(19) Development, adoption, implementation, operation, maintenance, or use of an enhanced emergency communication system.

Whether or not immunity applies is determined by whether the loss resulted from the use

of such a system, not from the manner in which it was used. *Giles v. Brown County*, 839

N.E.2d 1258, 1266 (Ind. Ct. App. 2005), *trans. granted and dissenting opinion adopted* at

868 N.E.2d 478 (Ind. 2007). This is true even if the loss results from "misuse by human

error" in the use of the system, like the misuse alleged by the Plaintiff. *Id*. at 1267. *See*

*also Burns v. Terre Haute*, 744 N.E.2d 1038, 1039-40 (Ind. Ct. App. 2001) (finding

immunity applied when 911 dispatcher gave ambulance drivers directions "off the top of

his head" rather than using the system to map the location by computer; the ambulance

drivers were unable to locate the house easily due to incorrect directions); *Barnes v.*

*Antich*, 700 N.E.2d 262, 265 (Ind. Ct. App. 1998), *trans. denied* (city entitled to immunity

when dispatchers repeatedly assured caller that an ambulance was on route when in fact

that ambulance was never dispatched).

Here, Plaintiff concedes that at the time Officer Leonard received Hammack's 911

call, she was using an enhanced emergency communications system. Nevertheless,

Plaintiff contends that immunity does not apply because "the loss resulted from [Officer]

Leonard's gross negligence in obtaining information from Hammack." (Plaintiff's

Response at 33). Plaintiff's distinction makes no difference. The fact remains that at the

time she failed to ask the appropriate questions, she was using an enhanced emergency

communications system. Accordingly, the City is entitled to immunity under the ITCA

for Officer Leonard's alleged negligence.

## 2. Negligence Claim

Plaintiff's wrongful death claim is based on a theory of negligence. In essence,

Plaintiff alleges that the officers used an unreasonable amount of force under the circumstances. For the reasons explained in Section IV.A.1 of this opinion, the court finds material issues of fact exist, precluding summary judgment on this claim.

### 3.     Failure to Train

Plaintiff alleges a state law failure to train claim. Neither party, however, addresses this claim in their briefs. The court infers, therefore, that this claim is waived.

## VI.    Conclusion

For the reasons set forth above, the court **GRANTS in part** and **DENIES in part**, Defendants' Motion for Summary Judgment (Docket # 46). Specifically, the court **GRANTS** Defendants' motion with respect to Plaintiff's Section 1983 failure to train claim, and **GRANTS** Defendants' motion with respect to Plaintiff's negligence and failure to train claims. The court **DENIES** Defendants' motion with respect to Plaintiff's Section 1983 excessive force claim, and **DENIES** Defendants' motion with respect to Plaintiff's state law wrongful death claim. The also **DENIES** Plaintiff's Motion for Oral Argument (Docket # 69).

**SO ORDERED** this 16th day of November 2010.


_____
RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana

Electronic Copies to:

Samuel Mark Adams
MICHAEL K. SUTHERLIN AND ASSOCIATES
msutherlin@gmail.com

Max Eric Fiester
RUDOLPH FINE PORTER & JOHNSON
mef@rfpj.com

Stacy K. Newton
RUDOLPH FINE PORTER & JOHNSON
skn@rfpj.com

Ross E. Rudolph
RUDOLPH FINE PORTER & JOHNSON
rer@rfpj.com

Michael K. Sutherlin
MICHAEL K. SUTHERLIN & ASSOCIATES, PC
msutherlin@gmail.com